STATE OF IOWA v. JONAS R. GRINDEN, Appellant.

**Evidence to Rebut Testimony as to Good Character of Defendant: Competency.** Where witnesses say that they can not say anything about defendant's character, or that they never heard people talk about him before the crime charged occurred, they should not be allowed to state what defendant's moral character is, or in what estimation he is held by the people.

*Appeal from Story District Court.*—HON. D. R.
HINDMAN, Judge.

SATURDAY, SEPTEMBER 29, 1894.

THE defendant was indicted for the crime of mur-
der.   He was convicted of manslaughter, and sentenced
to imprisonment in the penitentiary for five years, and
he appeals.—*Reversed.*

*J. F. Martin, H. M. Funson,* and *George R. Cloud*
for appellant.

*John Y. Stone,* Attorney General, and *Thomas A.
Cheshire* for the state.

ROTHROCK, J.—I.  · The defendant was jointly in-
dicted with one John Grandy for murder in the first
degree, by taking the life of one Allen Lloyd.   Grandy
pleaded guilty before the defendant was tried.   The
defendant pleaded not guilty, and it is claimed in his
behalf that he is not properly chargeable with any
offense, unless it may be an assault and battery upon
the person of Lloyd.   He claims that his codefendant
was the real culprit, and that Lloyd came to his death
by the violence of Grandy alone.   The facts leading up
to the death of Lloyd, stated in a general way, are as
follows:  Lloyd, Grandy, and the defendant were all
boarders and lodgers at an hotel at a village in Story
county known as Roland.   The sleeping rooms were all
on one floor, on each side of a hall which ran clear
through the house.   Grandy was engaged in carrying
on a barber shop in the village.   It does not appear
what Lloyd's occupation was, further than that a few
days before his death he was engaged in paper hanging
in one of the defendant's houses.   The defendant is a
young man, twenty-three years old, and weighs one
hundred and thirty pounds.   He had laid out some lots

as an addition to the village, and was engaged in looking after his business in connection therewith. Lloyd was very intemperate in the use of intoxicating liquors. He was for most of the time in a beastly state of intoxication. He was very abusive and profane, and appeared to delight in denouncing about every person he met with vile names and epithets. For much of the time he was so drunk that he kept his bed, and uttered his vile speech in denunciation of people generally. The evidence shows pretty conclusively that he stole a watch and some money from the defendant's clothing, while hanging paper for him. Grandy claimed to be incensed at Lloyd's abuse, and made threats that if he continued it he (Grandy) would do him up, and beat the life out of him. Late in the night of the twentieth day of May, 1893, Loyd was in his room, alone, using the usual epithets. The defendant was in his own room, opposite to Lloyd's room, preparing to retire for the night, and one or two other boarders were in their rooms, when Grandy, the barber, came from his shop, and went upstairs, and heard Lloyd abusing him, and went to his room, and commenced an assault upon Lloyd. He struck him several hard blows with his fists. Mrs. Johnson, the landlady of the house, appeared upon the scene, and attempted to stop the affray. After Grandy had struck Lloyd several heavy blows on Lloyd's head, the defendant and another boarder appeared at the door, and the defendant went in the room and slapped Lloyd once or twice in the face with his open hand. There is no evidence that the violence used by the defendant was the cause of the death of Lloyd, or that it contributed thereto. The evidence conclusively shows that he came to his death by reason of the blows inflicted by Grandy. Counsel for the defendant insist that the verdict is contrary to the evidence, because it utterly fails to show that the defendant was accessory to, or aided or abetted Grandy in, taking the life of the

deceased. As the judgment must be reversed on other grounds, and the case may probably be again tried, we do not pass upon the sufficiency of the evidence to connect the defendant with the killing of Lloyd. We may say, however, that there was no evidence of any concert of action between defendant and Grandy, by word or act, further than that the defendant went into the room after Grandy had struck the fatal blows, and slapped Lloyd once or twice in the face. Grandy had made previous threats of violence. There is no evidence that the defendant made threats, or in any manner expressed hostility, toward the deceased.

II. The defense introduced some six witnesses, who testified that they had known the defendant since he was a small boy, and that he was of a peaceable and orderly character, and of good reputation. One of these witnesses was cashier of a bank, another was a grain merchant, another was county recorder. To rebut this evidence, the state introduced two witnesses, whose testimony, as shown in the record, was as follows: "E. R. Sheldahl, sworn and examined on the plaintiff's part, states: 'I live at Roland, and know Grinden. Q. Do you know the general moral character of Grinden in the community where he lives? A. Can not say I know anything about it. Q. You may now tell us what you think Grinden's moral character is. (Objected to by defendant as incompetent. Objection overruled, and defendant excepts.) A. If a man drinks, swears a little, my opinion is he is not very good. Q. Well, in your opinion, was he a good, moral man? (Same objection, and because no time is specified. Same ruling. Same exception.) A. I have seen him drink.' Jeremiah Olson, sworn on the plaintiff's part, states: 'I live four miles south of Roland, and am a farmer. I just know the defendant when I see him; that is all. Q. State if you know what the people think of him up there, in regard

to his character. (Objected to as incompetent. Objection overruled, and defendant excepts.) *A.* There are always two classes of people. The better class say his character was not good. *Q.* State what estimation he was held in up there. (Same objection. Same ruling. Same exception,) *A.* Don't know much about him. Never heard people talk about him before this occurred. Since then I have heard them talk a little. *Q.* State how his estimation is held up there, in the estimation of the people. (Same objection. Same ruling.) *A.* It is held bad.'" The above is copied from the abstract, and it is not disputed by counsel for the state that it is a correct record of what occurred in the examination of these two witnesses. The form of questions to be propounded to witnesses upon character or reputation is well understood, and need not be set out here. This whole line of examination was improper, and ought not to have been allowed. When the witness Sheldahl stated that he could not say anything about the character of defendant, his examination should have closed. When the witness Olson answered that he knew nothing about defendant, and never heard people talk about him before this matter occurred, his examination should have ceased. We can not say that the permission to pursue this method of attack on character was not prejudicial. The case presented by the evidence of defendant's participation in the affair was one in which the good character of the defendant was a most important consideration, and, when the state called its witnesses in rebuttal, proper questions should have been propounded, and only legitimate evidence allowed to be introduced.

III. The defendant claimed that he was entitled to a new trial because of newly discovered evidence. As we reverse the judgment for the error last above discussed, it is unnecessary to pass upon this feature of the case. But, that it may be understood how it oc-

curred that Lloyd's skull was fractured, we may say
that evidence was discovered after the trial that Grandy
went into the room with metallic knuckles concealed in
his hand, and that the killing was accomplished by the
use of the knuckles, which were afterward found at the
place where he concealed them the next morning after
the tragedy. For the error above pointed out, the judg-
ment is REVERSED.